Filed 9/18/15  P. v. Charfauros CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D064666 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD235440) |
| ALEX CHARFAUROS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Kenneth K. So, Judge.  Affirmed as modified.

Raymond Mark DiGuiseppe, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal and Tami Falkenstein Hennick, Deputy Attorneys General, for Plaintiff and Respondent.

A jury found Alex Charfauros guilty of 15 criminal offenses arising from an incident on October 27, 2010, in which San Diego Police Officer Christopher Wilson was shot and killed while forcing entry into a closed bedroom in Charfauros's apartment. Specifically, Charfauros was found guilty of second degree murder of a police officer (Pen. Code, §§ 187, subd. (a), 190, subd. (b) [count 1]);[1] four counts of premeditated attempted murder of a police officer (§§ 664, subd. (e), 187, subd. (a), 189 [counts 2-5]); attempting to harm a police dog resulting in serious injury (§§ 600, subds. (a), (c), 664 [count 6]); four counts related to the possession or sale of methamphetamine (§ 182, subd. (a)(1); Health & Saf. Code, §§ 11379 [count 15], 11370.1, subd. (a) [count 7], 11378 [count 9], 11366 [count 12]); resisting, delaying or obstructing a police officer (§ 148, subd. (a)(1) [count 16]) and conspiracy to commit the same offense (§§ 148, subd. (a)(1), 182, subd. (a)(1) [count 13]); conspiracy to commit an act injurious to the public health or public morals or to pervert or obstruct justice or the due administration of the laws (§ 182, subd. (a)(5) [count 14]); possession of a firearm by a felon (former § 12021, subd. (a)(1) [count 10]); and unlawful possession of ammunition (former § 12316, subd. (b)(1) [count 11]).  In connection with several of the counts, the jury also found that Charfauros was vicariously armed with a firearm (§ 12022, subd. (a)(1)).

The trial court sentenced Charfauros to prison for an indeterminate term of 85 years to life, plus a determinate term of 11 years.

---

[1]    Unless otherwise indicated, all further statutory references are to the Penal Code.

Charfauros contends (1) insufficient evidence supports the convictions for murder, attempted murder and serious injury to a police dog; (2) the trial court prejudicially erred in admitting certain testimony of law enforcement officers; (3) the trial court improperly imposed an enhanced sentence for the attempted murder counts based on findings that the attempted murders were willful, deliberate and premeditated, as that allegation was not made in the indictment; (4) the trial court improperly imposed and stayed full-term sentences on certain of the subordinate determinate terms, i.e., counts 7, 9, 10, 11, 12 and 14, instead of one-third the middle-term sentence; and (5) the trial court erred in the amount of the laboratory fee imposed under Health and Safety Code section 11372.5, subdivision (a).

We conclude Charfauros's last two arguments have merit, but reject all of the others.  Accordingly, we modify the judgment to reflect corrected sentences on counts 7, 9, 10, 11, 12 and 14 and a corrected laboratory fee.  As modified, we affirm the judgment.[2]

I

FACTUAL AND PROCEDURAL BACKGROUND

In October 2010, Charfauros, who was on probation, lived in a two-bedroom upstairs apartment in San Diego with Holim Lee and Lee's girlfriend, Lucky Xayasene. Lee was wanted on a warrant for assault with a deadly weapon, and United States

---

[2]     Charfauros has also filed a petition for writ of habeas corpus (*In re Alex Charfauros*, D066787).  On October 21, 2014, we indicated that habeas petition would be considered at the same time as this appeal.  In an order concurrently filed with this opinion, we have denied the petition for writ of habeas corpus.

Marshal Service Deputy Jeffrey Roxas obtained information that Lee had been seen two weeks earlier at Charfauros's apartment. In an attempt to ascertain Lee's whereabouts, Deputy Roxas asked Charfauros's probation officer, Officer Bobby Burns, if they could go together to search Charfauros's apartment.

On October 27, 2010, around 10:00 p.m., a group of probation officers and United States Marshals Service deputies arrived unannounced at Charfauros's apartment to conduct a probation search. As the officers prepared to knock on the apartment door, the door was opened from inside by a surprised Asian man. Officer Burns did not think the man looked like Charfauros, and he therefore asked if Charfauros was there. The man said, "Nope," and slammed and locked the door.

The officers kicked in the locked door and began to move through the apartment. A bedroom door at the end of the hallway was hanging off its hinges and had a large hole in the middle. That bedroom was later determined to be Charfauros's room. The door to the second bedroom was closed. That bedroom was later determined to be Lee and Xayasene's bedroom.

Meanwhile, an officer posted outside the apartment saw Charfauros trying to climb down a ladder out of his bedroom window. The officer directed Charfauros to go back inside the apartment, and Charfauros complied. A short time later, the officers inside the apartment saw Charfauros's hand extending out of the doorway of his bedroom. Charfauros eventually complied with orders to get down on the ground and crawl down the hallway to the living room. Charfauros was handcuffed and taken out onto a landing and then downstairs into a courtyard.

Based on Officer Burns's belief that Charfauros was not the person who opened and then slammed the door, the officers believed someone else was likely still inside the apartment, and they radioed for assistance from the San Diego Police Department. While waiting for the police officers to arrive, several probation officers heard clicking or crackling sounds coming from Lee and Xayasene's closed bedroom.

After Charfauros was taken into custody, police officers, probation officers and United States Marshals Service deputies repeatedly asked Charfauros to tell them who was in the apartment and whether there were any weapons or drugs in the apartment. Charfauros was questioned by several officers from the time he was handcuffed in the apartment through the time that he was detained downstairs in the courtyard. Officers who participated in or overheard the questioning of Charfauros testified that Charfauros replied that he did not know who was in the apartment because he had been asleep before the officers arrived. Several officers heard Charfauros state that there were no weapons in the apartment.

San Diego Police Department officers arrived on the scene and relieved the probation officers and United States Marshals Service deputies who were posted in the apartment. Police officers determined based on photographic identifications made by some of the probation officers that the person who opened and then slammed the door to the apartment was likely Lee, and that Lee was still in the apartment.

Police officers decided to employ a police dog and to attempt to gain entry to Lee and Xayasene's closed bedroom by kicking in the door. While San Diego Police Officer Lorenzo Ruiz kicked in the door, San Diego Police Officers Michael Chinn, Travis

5

Whipple, Christopher Wilson and Michael McLeod, along with his police dog Monty, took positions in the apartment. Immediately after Officer Ruiz kicked open the bedroom door, a volley of gunfire erupted from inside the bedroom. Officers McLeod, Chinn and Whipple returned fire. Officer Wilson was fatally shot in the head. Police dog Monty received a gunshot wound to his snout.

During the shooting, Charfauros remained handcuffed in the downstairs courtyard, still claiming that he did not know who was in the apartment and that no weapons were present. One officer testified that during the shooting, Charfauros said, " 'Oh shit, oh shit. I can't believe this is happening.' " Approximately 20 minutes had elapsed from the time that Charfauros was taken out of the apartment in handcuffs to the eruption of gunfire inside the apartment.

The officers called for the assistance of the SWAT team, and the apartment was eventually cleared. Lee and Xayasene were found dead in the bedroom, having both committed suicide by gunshots to their heads. Two other people, Patrick Luangrath and Melissa Ortiz were removed from the bedroom and taken into custody. There were several firearms in Lee and Xayasene's bedroom, along with ammunition. In addition over 80 grams of methamphetamine was found in the apartment. Lee's gun fired the shot that killed Officer Wilson. Xayasene had a .45 caliber handgun in her hand, which was determined to have also fired rounds. Charfauros's DNA was found on a shotgun that was recovered from Lee and Xayasene's bedroom, and shotgun shells were located in Charfauros's bedroom.

6

Charfauros was charged with the murder of Officer Wilson; the attempted murder of Officers Ruiz, Chinn, Whipple and McLeod; causing serious injury to police dog Monty; along with nine other charges, including resisting a police officer, charges related to the methamphetamine and the firearms and ammunition found in the apartment, and two other conspiracy charges.

At trial, several officers testified that Charfauros's refusal to give information about who was in the apartment and his statements that there were no weapons in the apartment were important factors in how events developed. As the officers testified, had Charfauros told them that firearms were present in the closed bedroom, they would have called for a SWAT team response rather than attempting to enter the closed bedroom themselves.

Several officers also testified at trial that although Officer Burns did not believe at the time of the incident that Charfauros was the person at the apartment door, upon further review of photographic evidence, they concluded that it was Charfauros, not Lee, who opened and then slammed the apartment door. The jury also heard evidence that Charfauros was an active member of a criminal street gang and was selling methamphetamine together with Lee. Videos from cell phones found in the apartment showed Charfauros, Lee and Xayasene smoking methamphetamine in Lee and Xayasene's bedroom on multiple occasions and established that there had been several guns in plain sight in the apartment's living room and Lee and Xayasene's bedroom on October 26, 2010, the day before the shooting.

7

The jury found Charfauros guilty of second degree murder of a police officer (§§ 187, subd. (a), 190, subd. (b) [count 1]); four counts of willful, deliberate and premeditated attempted murder of a police officer (§§ 664, subd. (e), 187, subd. (a), 189 [counts 2-5]); attempting to harm a police dog resulting in serious injury (§§ 600, subds. (a), (c), 664 [count 6]); possessing methamphetamine while armed with a firearm (Health & Saf. Code, § 11370.1, subd. (a) [count 7]); possession for sale of methamphetamine (*id.*, § 11378 [count 9]); maintaining a place for selling methamphetamine (*id*., § 11366 [count 12]); conspiracy to sell or furnish methamphetamine (Pen. Code, § 182, subd. (a)(1); Health & Saf. Code, § 11379 [count 15]); resisting, delaying or obstructing a police officer (§ 148, subd. (a)(1) [count 16]); conspiracy to delay or obstruct a police officer (§§ 148, subd. (a)(1), 182, subd. (a)(1) [count 13]); conspiracy to commit an act injurious to the public health or public morals or to pervert or obstruct justice or the due administration of the laws (§ 182, subd. (a)(5) [count 14]); possession of a firearm by a felon (former § 12021, subd. (a)(1) [count 10]); and unlawful possession of ammunition (former § 12316, subd. (b)(1) [count 11]).  For several of the counts, the jury further found that that Charfauros was vicariously armed with a firearm.  (§ 12022, subd. (a)(1).)

Charfauros was sentenced to prison for an indeterminate term of 85 years to life, plus a determinate term of 11 years.

8

II

DISCUSSION

A.      *Substantial Evidence Supports the Conviction for the Assaultive Crimes*

Charfauros contends that his convictions for the second degree murder of Officer Wilson, four counts of attempted murder and one count of seriously injuring a police dog (collectively, the assaultive crimes) are not supported by substantial evidence.  As we will explain, we reject Charfauros's argument.

In considering a challenge to the sufficiency of the evidence, "we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence — that is, evidence that is reasonable, credible, and of solid value — from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt . . . .  We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. . . .  If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. . . .  'A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.' " (*People v. Albillar* (2010) 51 Cal.4th 47, 60, citations omitted.)

1.      *The People's Theories of Charfauros's Criminal Liability for the Assaultive Crimes*

The People presented three theories of Charfauros's criminal liability for the assaultive crimes:  (1) Charfauros was guilty of conspiring with Lee and Xayasene to resist, obstruct or delay a peace officer (as charged in count 13) and to commit an act

9

injurious to the public health or morals or to pervert or obstruct justice and the due administration of the laws (as charged in count 14),[3] with the natural and probable consequence of Charfauros's participation in that conspiracy being Lee and Xayasene's commission of the assaultive crimes; (2) Charfauros aided and abetted Lee and Xayasene in resisting, obstructing or delaying a peace officer (as charged in count 16), with the natural probable consequence of those offenses being the commission of the assaultive crimes; and (3) Charfauros aided and abetted the assaultive crimes committed by Lee and Xayasene.[4]

Charfauros contends that none of these theories of criminal liability for the assaultive crimes are supported by substantial evidence. As we will explain, we find at least two of these theories supported by substantial evidence, and we accordingly reject Charfauros's challenge to the sufficiency of the evidence for the assaultive crimes.

---

[3] Counts 13 and 14 relied on the same criminal conduct, namely the coconspirators' resistance and obstruction of law enforcement officers on October 27, 2010. However, as the prosecutor explained during closing argument, the charges in count 14 were intended to be broader than the charges in count 13, because they also encompassed resistance and obstruction of the United States Marshals Service deputies. (See § 830.1 [defining peace officer].) As the criminal acts giving rise to both counts are the same, we discuss the substantial evidence supporting those counts together.

[4] The jury was instructed to consider whether Charfauros was guilty of first degree murder or second degree murder, and it returned a verdict of second degree murder. After the trial in this case, our Supreme Court established that "a defendant cannot be convicted of first degree premeditated murder under the natural and probable consequences doctrine." (*People v. Chiu* (2014) 59 Cal.4th 155, 167 (*Chiu*).) As Charfauros was convicted of second degree murder, *Chiu*'s holding does not impact Charfauros's conviction.

10

2.    *Charfauros's Criminal Liability for the Assaultive Crimes as a Natural and Probable Consequence of a Conspiracy to Resist, Delay or Obstruct a Peace Officer or Obstruct Justice as Charged in Counts 13 and 14*

We first discuss whether substantial evidence supports Charfauros's conviction for the assaultive crimes on the theory that the assaultive crimes were a natural and probable consequence of the crime of conspiracy to resist, delay or obstruct a peace officer or obstruct justice as charged in counts 13 and 14.

The question of whether substantial evidence supports a criminal conviction for the assaultive crimes under this theory breaks down into two distinct issues.  The first issue is whether substantial evidence supports a finding that Charfauros committed the crimes charged in counts 13 and 14, in that he conspired to resist, delay or obstruct law enforcement officers.  Second, assuming that Charfauros was properly convicted of the commission of the conspiracy to resist, delay or obstruct the law enforcement officers as charged in counts 13 and 14, the next issue is whether substantial evidence supports a finding that the assaultive crimes were a natural and probable consequence of that conspiracy.  We examine each issue in turn.

a.    *Substantial Evidence Supports a Finding That Charfauros Committed the Crimes of Conspiring to Resist, Delay or Obstruct Law Enforcement Officers as Charged in Counts 13 and 14*

" 'A conviction of conspiracy requires proof that the defendant and another person had the specific intent to agree or conspire to commit an offense, as well as the specific intent to commit the elements of that offense, together with proof of the commission of an overt act 'by one or more of the parties to such agreement' in furtherance of the conspiracy.' "  (*People v. Russo* (2001) 25 Cal.4th 1124, 1131.)  Here the underlying

11

substantive offense for the conspiracy in count 13 was the crime of resisting, delaying or obstructing a peace officer in the commission of his or her duties in violation of section 148. The crime is committed if " '(1) the defendant willfully resisted, delayed, or obstructed a peace officer, (2) when the officer was engaged in the [lawful] performance of his or her duties, and (3) the defendant knew or reasonably should have known that the other person was a peace officer engaged in the performance of his or her duties.' " (*People v. Ghebretensae* (2013) 222 Cal.App.4th 741, 759.) The underlying substantive offense for the conspiracy in count 14 was the crime of perverting or obstructing justice, or the due administration of the laws in violation of section 182, subdivision (a)(5). That substantive offense includes "anything done by a person in hindering or obstructing an officer in the performance of his official obligations." (*Lorenson v. Superior Court* (1950) 35 Cal.2d 49, 59.)

The People's theory of Charfauros's liability for counts 13 and 14 was that Charfauros specifically agreed with Lee and Xayasene that if law enforcement officers ever attempted to enter the apartment, they would violently resist. As alleged in the indictment and set forth in the jury instructions, the People identified several overt acts by Charfauros, Lee and Xayasene in support of the conspiracy, including Charfauros's slamming and locking of the apartment door when he encountered the officers at the door; Charfauros's statement to the officers that no weapons were present in the apartment, which served to lead the officers into an ambush situation; and Lee and Xayasene's subsequent shooting at the officers after the bedroom door was kicked open. As it is beyond dispute that ample evidence supports a finding that Charfauros, Lee and

12

Xayasene committed those overt acts, the only disputed issue is whether substantial evidence supports a finding that Lee, Xayasene and Charfauros specifically entered into a conspiratorial agreement to violently resist if law enforcement officers came to the apartment. We therefore turn to that issue.

Although there is no *direct* evidence of an agreement between Lee, Xayasene and Charfauros to violently resist law enforcement officers, an agreement between coconspirators may be proven through circumstantial evidence. (*People v. Homick* (2012) 55 Cal.4th 816, 870 [an agreement between coconspirators " 'must often be proved circumstantially' "].) " 'The existence of a conspiracy may be inferred from the conduct, relationship, interests, and activities of the alleged conspirators before and during the alleged conspiracy.' " (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1135.) Here, the record contains sufficient circumstantial evidence to support a finding that Lee, Xayasene and Charfauros agreed to violently resist if law enforcement officers ever entered the apartment.

Initially, we observe that the evidence showed that Lee, Xayasene and Charfauros had good reason to expect that it might be necessary for them to resist law enforcement. The evidence established that Lee and Charfauros were committing the crime of selling methamphetamine out of the apartment, and Lee was a wanted fugitive. Charfauros, Lee and Xayasene all knew that there was a possibility that police would enter the apartment at some point. Specifically, Charfauros was on probation with a waiver of his Fourth Amendment right to be free from warrantless searches of his residence, and his probation officer had recently spoken to him on the telephone indicating that he intended to visit

13

Charfauros's residence. Further, the jury heard testimony about a recent incident at the apartment in which Charfauros, Lee and Xayasene were concerned that police may have been outside. With Charfauros's and Lee's awareness of the risk that police would enter the apartment, discover their drug-related activity and take Lee into custody on his warrant, a finder of fact reasonably could draw the inference that Lee, Xayasene and Charfauros considered and discussed how they would respond if law enforcement officers arrived at the apartment. Further, the fact that Lee, Xayasene and Charfauros kept multiple firearms in the apartment is circumstantial evidence that they had decided to respond to the risk of law enforcement arriving at the apartment by arming themselves and making the necessary preparations to violently resist.

The strongest indication that Lee, Xayasene and Charfauros agreed to violently resist law enforcement comes from a statement that Charfauros made to family members in a telephone call from jail two weeks after the shooting. During that conversation, Charfauros reiterated several times that he was "supposed to be dead with" Lee, and stated that it was "a thin line between what I chose that day" and what could have happened. Charfauros's statement about what was "supposed to" happen supports an inference that Charfauros and Lee had a preconceived plan to violently resist law enforcement officers together. Further, as the People point out, at trial the jury was shown evidence of a large sign in Lee and Xayasene's bedroom stating, "We must protect this house," and Charfauros repeated those words in a video found on a cell phone in the apartment. The fact that Lee, Xayasene and Charfauros were associated with the phrase "We must protect this house" on a sign in the apartment is further evidence of an

14

agreement to engage in violence to protect the apartment if law enforcement entered. Also supporting a finding that Lee and Charfauros had agreed to support each other in resisting law enforcement is the fact that Charfauros was recorded in a conversation while in custody explaining that he "had [Lee's] back."

In addition, Charfauros's act of slamming the apartment door on the law enforcement officers and falsely stating that there were no weapons in the apartment is conduct consistent with an agreement to resist. A reasonable finder of fact could view that conduct as further circumstantial evidence that Charfauros was acting according to a preconceived plan with Lee and Xayasene to resist law enforcement officers if they arrived at the apartment.

Charfauros contends that his attempted escape out of the window and eventual surrender shows that that he was *not* acting according to a plan to violently resist. Although that is one inference that could be drawn from those facts, it is not the only reasonable inference. An equally valid interpretation of the facts is that because all of the guns were in Lee and Xayasene's closed bedroom when law enforcement officers arrived, with no firearms in Charfauros's bedroom, Charfauros did not have immediate access to weapons for violent resistance, and thus he carried out the agreement to violently resist by initially slamming the door on the officers and then giving them false information that there were no guns in the apartment, which led the officers into an unexpected violent ambush by Lee and Xayasene.

In sum, based on the circumstantial evidence, substantial evidence supports findings that (1) Lee, Xayasene and Charfauros entered into an agreement with the intent

15

to violently resist law enforcement officers if they arrived at the apartment; and (2) Lee, Xayasene and Charfauros engaged in several overt acts in support of that agreement. Accordingly, substantial evidence supports the finding that Charfauros took part in a conspiracy to resist law enforcement officers as charged in counts 13 and 14.[5]

      b.      *Substantial Evidence Supports a Finding That the Assaultive Crimes Were a Natural and Probable Consequence of the Conspiracy to Resist, Delay or Obstruct Law Enforcement Officers*

Having determined that substantial evidence supports a finding that Charfauros took part in a conspiracy to resist law enforcement, the next issue is whether the assaultive crimes were a natural and probable consequence of that conspiracy.

Charfauros may be found criminally liable for the natural and probable consequences of participation in the conspiracy to resist law enforcement under the well-established rule " 'that each member of a conspiracy is criminally responsible for the acts of fellow conspirators committed in furtherance of, and which follow as a natural and probable consequence of, the conspiracy, even though such acts were not intended by the conspirators as a part of their common unlawful design.' " (*People v. Guillen* (2014) 227 Cal.App.4th 934, 998.)

---

[5]     Although not discussing the argument under a separate argument heading in his appellate brief, in the course of discussing his claim that insufficient evidence supports his conviction for the assaultive crimes, Charfauros also asserts that his convictions for conspiracy in counts 13 and 14 are not supported by substantial evidence and should be reversed. We reject that argument because, as we have explained, substantial evidence supports a finding that Charfauros took part in a conspiracy to resist, delay or obstruct law enforcement as charged in counts 13 and 14.

"A nontarget offense is a 'natural and probable consequence' of the target offense if, judged objectively, the additional offense was *reasonably foreseeable*." (*Chiu*, *supra*, 59 Cal.4th at p. 161, italics added.) "[T]he issue does not turn on the defendant's subjective state of mind, but depends upon whether, under all of the circumstances presented, a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonably foreseeable consequence . . . ." (*People v. Nguyen* (1993) 21 Cal.App.4th 518, 531 (*Nguyen*).) "For a criminal act to be a 'reasonably foreseeable' or a 'natural and probable' consequence of another criminal design it is not necessary that the collateral act be specifically planned or agreed upon, nor even that it be substantially certain to result from the commission of the planned act. For example, murder is generally found to be a reasonably foreseeable result of a plan to commit robbery and/or burglary despite its contingent and less than certain potential." (*Id*. at p. 530.) " '[T]o be reasonably foreseeable "[t]he consequence need not have been a strong probability; a possible consequence which might reasonably have been contemplated is enough." ' " (*People v. Medina* (2009) 46 Cal.4th 913, 920.) "A reasonably foreseeable consequence is to be evaluated under all the factual circumstances of the individual case . . . and is a factual issue to be resolved by the jury." (*Ibid*., citation omitted.)[6]

---

6      Specifically in the context of a conspiracy as the target crime, the application of the natural and probable consequences is limited by the principle that " ' "the act must be the ordinary and probable effect of the wrongful act specifically agreed on, so that the connection between them may be reasonably apparent, and not a fresh and independent

Here, the assaultive crimes were a reasonably foreseeable consequence of the conspiracy to resist law enforcement officers as charged in counts 13 and 14. As we have explained, the evidence supports a finding that Lee and Charfauros agreed to violently resist law enforcement officers, and in furtherance of that conspiracy they took the step of keeping several firearms in the apartment. Under any objective standard, it is reasonably foreseeable that one of the consequences of a violent resistance to law enforcement officers by persons armed with firearms is that law enforcement officers, including any police dogs present, are going to be shot at and possibly injured or killed. Indeed, the murder and attempted murder of a police officer is one of the most obvious and easily contemplated consequences of offering violent resistance with firearms when law enforcement officers force entry into a residence.

Charfauros contends that the natural and probable consequences doctrine does not apply here because the underlying target offense was " 'trivial.' " For this argument, Charfauros relies on our Supreme Court's observation that "[m]urder, for instance, is *not* the 'natural and probable consequence' of 'trivial' activities. To trigger application of the 'natural and probable consequences' doctrine, there must be a close connection between the target crime . . . and the offense actually committed." (*Prettyman*, *supra*, 14 Cal.4th at p. 269.) According to Charfauros, the offense of conspiracy to resist law enforcement was a trivial offense compared to the assaultive crimes, and thus there was not a sufficiently close connection for the application of the natural and probable consequences

product of the mind of one of the confederates outside of, or foreign to, the common design." ' " (*People v. Prettyman* (1996) 14 Cal.4th 248, 260-261 (*Prettyman*).)

18

doctrine. We disagree. Under no reasonable interpretation can a conspiracy to violently resist law enforcement by using firearms be considered a trivial offense; instead it is a serious and violent offense with a close connection to the crimes of murder, attempted murder and the serious injury to a police dog that occurred here.

Charfauros further argues that the natural and probable consequence doctrine does not apply because "an independent intervening cause cut off any such liability." Specifically, Charfauros contends that the police officers' decision to kick in the door was an independent intervening cause. " 'In general, an "independent" intervening cause will absolve a defendant of criminal liability. . . . However, in order to be "independent" the intervening cause must be "unforeseeable . . . an extraordinary and abnormal occurrence, which rises to the level of an exonerating, superseding cause." . . . On the other hand, a "dependent" intervening cause will not relieve the defendant of criminal liability. "A defendant may be criminally liable for a result directly caused by his act even if there is another contributing cause. If an intervening cause is a normal and reasonably foreseeable result of defendant's original act the intervening act is 'dependent' and not a superseding cause, and will not relieve defendant of liability." ' " (*People v. Cervantes* (2001) 26 Cal.4th 860, 871, citations omitted (*Cervantes*).)

Based on this principle, Charfauros argues that the police officers' decision to kick in the bedroom door, putting themselves in danger of an ambush, was unreasonable and possibly negligent in light of the officers' suspicion that an armed suspect was inside, and therefore the police officers' actions were an independent intervening cause of the assaultive crimes. However, in determining whether an independent intervening cause

19

absolves a defendant of criminal liability, it is not relevant whether police officers acted reasonably and without any contributory negligence. (*People v. Brady* (2005) 129 Cal.App.4th 1314, 1326 [" 'The test . . . is not whether the officers acted reasonably but rather whether defendant realized or should have realized that the officers would respond as they did.' "].)  Instead, the " '[t]he task of the jury is to determine whether the officers' response was so extraordinary that it was unforeseeable, unpredictable and statistically extremely improbable.' "  (*Id*. at p. 1327.)  Here the officers' actions in response to the situation were not " ' "unforeseeable" ' " and " ' "an extraordinary and abnormal occurrence." ' "  (*Cervantes*, *supra*, 26 Cal.4th at p. 871.)  There is nothing unusual, abnormal or extraordinary about police officers kicking in a door to a closed bedroom when suspects refuse to come out as demanded by law enforcement.  Indeed, such a course of events is to be expected as a result of resistance to law enforcement directives to emerge from a barricaded space.

In sum, as substantial evidence supports a finding that (1) Charfauros took part in a conspiracy to resist law enforcement as charged in counts 13 and 14; and (2) the murder of Officer Wilson, the attempted murder of the four other officers and the serious injury to Monty were a natural and probable consequence of the conspiracy to resist law enforcement, substantial evidence supports Charfauros's convictions for the assaultive crimes under the People's first theory of criminal liability, i.e., that those crimes were the natural and probable consequence of Charfauros's participation in a conspiracy to resist law enforcement.

20

3. *Charfauros's Criminal Liability for the Assaultive Crimes Is a Natural and Probable Consequence of Resisting, Delaying or Obstructing a Peace Officer as Charged in Count 16 Under an Aiding and Abetting Theory*

We next discuss the substantial evidence supporting the People's second theory of Charfauros's criminal liability for the assaultive crimes, namely that Charfauros aided and abetted Lee and Xayasene in resisting, obstructing or delaying a peace officer (as charged in count 16), leading to the assaultive crimes as a natural probable consequence.

a. *Substantial Evidence Supports a Finding That Charfauros Aided and Abetted Lee and Xayasene in Resisting, Delaying or Obstructing Peace Officers as Charged in Count 16*

The first question is whether the record contains substantial evidence that Charfauros aided and abetted Lee and Xayasene in resisting, delaying or obstructing peace officers as charged in count 16.[7]

" 'An aider and abettor is one who acts "with knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense." ' " (*People v. Smith* (2014) 60 Cal.4th 603, 611 (*Smith*).) " '[A] person who aids and abets the commission of a crime is a "principal" in the crime, and thus shares the guilt of the actual perpetrator.' " (*Ibid*.) As opposed to the

_____

[7] We note that there is also ample evidence that Charfauros *directly* committed the crime of resisting a peace officer as charged in count 16 by slamming the door and trying to escape out of the window. However, for the purpose of establishing Charfauros's vicarious criminal liability for the assaultive crimes, the People focused on the theory that Charfauros aided and abetted Lee and Xayasene's resistance of a peace officer and was therefore responsible for the natural and probable consequences of their resistance. We therefore focus our discussion on the evidence supporting Charfauros's aiding and abetting Lee and Xayasene's resistance of the peace officers rather than Charfauros's direct resistance.

required element of an *agreement* to resist law enforcement in the conspiracy counts that we have discussed above, "[a] person may aid and abet a criminal offense without having agreed to do so prior to the act." (*Nguyen*, *supra*, 21 Cal.App.4th at p. 531.) Thus, in determining whether substantial evidence supports Charfauros's conviction for aiding and abetting Lee and Xayasene's resistance to the peace officers, we focus on Charfauros's acts in support of Lee and Xayasene's resistance, without examining whether the parties reached any prior agreement that they would help each other violently resist law enforcement.

Here, substantial evidence supports a finding that Charfauros aided and abetted Lee and Xayasene in resisting the police officers at the apartment with knowledge of Lee and Xayasene's criminal purpose and with the intent to facilitate them. First, based on the fact Charfauros opened the front door to the apartment before the officers knocked on the door, jurors reasonably could infer that Charfauros was awake before the officers arrived and knew that his roommates Lee and Xayasene were home. Further, because Charfauros was present as Lee and Xayasene ignored law enforcement's repeated orders for the occupants of the bedroom to come out, a reasonable juror could also infer that Charfauros knew that Lee and Xayasene had decided to resist the law enforcement officers instead of complying and being taken into custody. Next, Charfauros engaged in conduct that specifically aided and abetted Lee and Xayasene's resistance. Specifically, Charfauros refused to tell the officers that Lee and Xayasene were in the apartment, and Charfauros lied about there not being any weapons in the bedroom with full knowledge that there were actually numerous firearms in Lee and Xayasene's bedroom. Substantial

22

evidence therefore supports a finding that by providing false information to law enforcement about the presence of weapons and refusing to confirm that Lee and Xayasene were in the apartment, Charfauros aided and abetted Lee and Xayasene in mounting a violent and unexpected ambush of law enforcement officers when they kicked in the bedroom door.

b. *Substantial Evidence Supports a Finding That the Assaultive Crimes Were a Natural and Probable Consequence of Charfauros's Aiding and Abetting Lee and Xayasene's Resistance of Peace Officers*

The next issue is whether substantial evidence supports a finding that the assaultive crimes were a natural and probable consequence of Charfauros's aiding and abetting of Lee and Xayasene's resistance of the peace officers.

The natural and probable consequences doctrine applies to a defendant who aids and abets another in committing a crime. "An aider and abettor is guilty not only of the intended, or target, crime but also of any other crime a principal in the target crime actually commits (the nontarget crime) that is a natural and probable consequence of the target crime." (*Smith*, *supra*, 60 Cal.4th at p. 611.) As under the natural and probable consequence doctrine as we have explained it in the context of the conspiracy claims, "liability ' "is measured by whether a reasonable person in the defendant's position would have or should have known that the charged offense was a *reasonably foreseeable* consequence of the act aided and abetted." ' " (*Ibid*., italics added.)

Here, a reasonable person in Charfauros's position should have known that a violent gun battle resulting in the murder of Officer Wilson, the attempted murder of the four other officers and serious injury to police dog Monty, was a reasonably foreseeable

23

consequence of Lee and Xayasene's resistance to the peace officers who were trying to extract them from the apartment. A reasonable person in Charfauros's position, with his knowledge that firearms were present in the apartment, would know that there was a significant risk of a deadly gun battle as a result of Lee and Xayasene's refusal to come out of the bedroom. As we have explained in the context of the conspiracy claims, a reasonable person should know that police officers are likely to force entry into a room to apprehend barricaded suspects, and that when firearms are involved, the incident may turn violent and deadly. Therefore, substantial evidence supports a finding that the assaultive crimes were a natural and probable consequence of Lee and Xayasene's resistance of peace officers, which Charfauros aided and abetted.[8]

In sum, having concluded that at least two of the People's theories of Charfauros's criminal liability for the assaultive crimes are supported by substantial evidence, we reject Charfauros's challenge to the sufficiency of the evidence to support the conviction on the assaultive crimes in counts 1 through 6.[9]

---

[8] To the extent that Charfauros contends (1) that the police officers' decision to force entry into the bedroom was an independent intervening cause of the assaultive crimes cutting off his liability for the natural and probable consequences of his aiding and abetting Lee and Xayasene's resistance of the peace officers, or (2) that the target crime of aiding and abetting Lee and Xayasene's resistance of peace officers was too "trivial" to support the application of the natural and probable consequences doctrine, those arguments fail for the same reasons we explained in the context of the conspiracy claims charged in counts 13 and 14.

[9] As we have explained, the People also proceeded under a third theory that Charfauros was guilty of the assaultive crimes because he directly aided and abetted Lee and Xayasene in committing those crimes. We need not, and do not, consider whether substantial evidence would support Charfauros's liability for the assaultive crimes on that

24

B.      *The Trial Court Did Not Err in Admitting Evidence of What Actions the Police Officers Would Have Taken Had Charfauros Informed Them That Weapons Were Present in the Apartment*

We next consider Charfauros's contention that the trial court prejudicially erred in admitting police officer testimony about the actions that they would have taken had Charfauros been truthful about the presence of weapons in the apartment.

During trial several police officers and one deputy of the United States Marshals Service testified that a SWAT team would have been called in to extract Lee and Xayasene from the bedroom had Charfauros told them that there were weapons in the apartment.  Specifically, as some of the police officers testified, it is department policy to call for a SWAT team response if officers obtain information that barricaded suspects possess firearms.

Charfauros contends that the trial court erred in admitting this evidence because (1) it was speculative; (2) it was irrelevant; and (3) any relevance was outweighed by the risk of undue prejudice.

1.      *The Appellate Challenge to the Admission of the Evidence Is Forfeited Because Defense Counsel Did Not Object*

We first consider whether Charfauros adequately preserved these arguments by making evidentiary objections during trial.  "Evidence Code section 353, subdivision (a) allows a judgment to be reversed because of erroneous admission of evidence only if an objection to the evidence or a motion to strike it was 'timely made and so stated as to make clear the specific ground of the objection.'  Pursuant to this statute,

theory as well, as we have determined that substantial evidence supports Charfauros's conviction for the assaultive crimes on two other theories.

25

' ". . . 'defendant's failure to make a timely and specific objection' on the ground asserted on appeal makes that ground not cognizable." ' " (*People v. Demetrulias* (2006) 39 Cal.4th 1, 20.) On appeal, a party "may not argue that the court should have excluded the evidence for a reason different from his trial objection." (*People v. Partida* (2005) 37 Cal.4th 428, 435.)

Defense counsel objected only during the testimony of the first witness who was asked about what actions law enforcement would have taken had Charfauros stated that firearms were present in the apartment. Specifically, during the testimony of Deputy United States Marshal Michael Banez, the prosecutor asked Deputy Banez what he meant when he told Charfauros immediately after the shooting that " 'none of this would have happened' " if Charfauros had revealed that there were firearms in the apartment. Defense counsel objected on relevancy grounds. The trial court did not sustain the objection on that ground, but then interposed its own objection that the question called for speculation, and it sustained its own objection. At a break in testimony, the prosecutor asked the trial court to reconsider its evidentiary ruling. The trial court explained that the question "What would you have done?" is speculative, but that the evidence that the prosecutor sought to elicit was relevant. The trial court suggested that although the question, as phrased, was speculative, "there may be alternate ways" to ask the question.

During the prosecutor's continued examination of Deputy Banez, the prosecutor returned to the issue but asked the question in a different way, inquiring *why* Deputy Banez told Charfauros that " 'none of this would have happened' " if Charfauros had

26

revealed there were firearms in the apartment. Defense counsel objected on relevancy grounds, and the trial court overruled the objection. At no point did defense counsel interpose an objection on the ground that the question called for speculation. Deputy Banez replied that he made the statement because "the callout would have been different[]. It would have ended differently" if Charfauros told him guns were in the apartment. The prosecutor then followed up by asking "how" it would have ended differently. Defense counsel did not object, and Deputy Banez explained that he would have called for SWAT team assistance.

Following Deputy Banez's testimony, six police officers testified — sometimes at significant length — that they would have called for a SWAT team response had they obtained information that weapons were present in the apartment. The prosecutor's questions that elicited the officers' testimony generally inquired what the officers would have done differently had Charfauros told them that firearms were present. Defense counsel made no objection to any of the testimony.

Charfauros acknowledges that he did not object to the six officers' testimony about what they would have done differently had they known that firearms were present. However, he contends that he has not forfeited his appellate challenge to the admission of that evidence because he made objections to the testimony of Deputy Banez on that same subject, and the objection was sustained, making any further objection futile. We disagree. "It has long been the rule that '[where] a party has once formally taken exception to a certain line or character of evidence, he is not required to renew the objection at each recurrence thereafter of the objectionable matter arising at each

27

examination of other witnesses; and his silence will not debar him from having the exception reviewed.' " (*People v. Antick* (1975) 15 Cal.3d 79, 95.) However, defense counsel's objection to the prosecutor's question about *why* Deputy Banez told Charfauros that " 'none of this would have happened' " if Charfauros had revealed there were firearms in the apartment is *not* an objection to the same line of questioning or the same evidence implicated by the police officers' testimony. The police officers were not asked why Deputy Banez stated that " 'none of this would have happened' " if they knew firearms were present, or even whether they agreed with that statement by Deputy Banez. Instead, the officers were asked *what they would have done differently* if Charfauros had told them there were firearms in the apartment. Indeed, when a similar question was asked of Deputy Banez, inquiring *how* things would have turned out differently if he knew firearms were present, defense counsel did *not* object.

In sum, as the only objection made by defense counsel was to a question about why Deputy Banez made a particular statement to Charfauros, and defense counsel never objected to the questioning of *any* witness, even Deputy Banez, about how officers would have proceeded differently had Charfauros revealed that firearms were present, Charfauros has not preserved an appellate argument that the evidence about what police officers would have done differently was improperly admitted.

Further, the only objection that defense counsel interposed during the relevant portion of Deputy Banez's testimony was based on relevancy. Defense counsel made no objection that the evidence was unduly speculative or should be excluded because its prejudicial nature outweighed its relevance under Evidence Code section 352. The lack

of any objection on the basis of speculation or Evidence Code section 352, even during Deputy Banez's testimony, provides an additional basis for our conclusion that Charfauros has forfeited his appellate challenge that the evidence should have been excluded on those grounds.

2. *Charfauros Has Not Established That Defense Counsel Was Ineffective*

Charfauros argues that in the event we conclude that he has forfeited his appellate challenge to the admission of the evidence about what the police officers would have done differently had they known that firearms were present, his conviction should be reversed on the ground that he received ineffective assistance of counsel because defense counsel failed to object to the admission of the evidence.

"Under both the Sixth Amendment to the United States Constitution and article I, section 15, of the California Constitution, a criminal defendant has the right to the assistance of counsel." (*People v. Ledesma* (1987) 43 Cal.3d 171, 215.) A defendant claiming ineffective assistance of counsel has the burden to show: (1) counsel's performance was deficient, falling below an objective standard of reasonableness under prevailing professional norms; and (2) the deficient performance resulted in prejudice. (*Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*); *Ledesma*, at pp. 216, 218.) Prejudice is shown when "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland*, at p. 694.) Further "[r]eviewing courts reverse convictions on direct appeal on the ground of incompetence of counsel only if the record on appeal

demonstrates there could be no rational tactical purpose for counsel's omissions." (*People v. Lucas* (1995) 12 Cal.4th 415, 442; see *People v. Anderson* (2001) 25 Cal.4th 543, 569.) "The decision whether to object to the admission of evidence is 'inherently tactical,' and a failure to object will rarely reflect deficient performance by counsel." (*People v. Castaneda* (2011) 51 Cal.4th 1292, 1335.)

As we will explain, Charfauros has not established that defense counsel performed below the standard of care by failing to object to questions about what the police officers would have done differently had they known that firearms were present, as defense counsel could reasonably have determined that the questions were not objectionable. Further, because the questions were not objectionable, Charfauros cannot establish that he was prejudiced by defense counsel's failure to object.

Charfauros's first contention is that defense counsel should have objected on the ground of relevancy to the questions about what the police officers would have done differently had Charfauros revealed that firearms were present in the apartment. However, evidence of how the police officers would have reacted had Charfauros revealed that weapons were present was centrally relevant to a main issue in the case. Specifically, as we have described, one of the People's central theories of Charfauros's criminal liability for the assaultive crimes was that those crimes were a natural and probable consequence of Charfauros's participation in Lee and Xayasene's resistance of the law enforcement officers, either as part of a conspiracy or as an aider and abettor. For his part in that resistance, Charfauros made false statements to law enforcement that no weapons were present in the apartment. Evidence that the police officers would not have

30

kicked in the bedroom door had Charfauros revealed the presence of weapons was highly relevant to establishing that, as a natural and probable consequence of Charfauros's actions, the police officers kicked in the bedroom door rather than calling in a SWAT team, leading to the assaultive crimes, including the murder of Officer Wilson and the serious injury to Monty.

Charfauros puts misplaced reliance on *People v. Schmies* (1996) 44 Cal.App.4th 38, 55-56, to support his argument that it was irrelevant whether the officers would have done anything differently had they known there were firearms in the apartment. *Schmies* held that in applying the natural and probable consequences doctrine, it is irrelevant whether police officers violated a departmental policy through their actions, as the issue is "not whether the officers acted reasonably but rather whether defendant realized or should have realized that the officers would respond as they did." (*Id*. at p. 55.) Here, however, questions about what the officers would have done differently had they known there were firearms in the apartment were *not* directed at eliciting testimony about a failure to follow police department policy. On the contrary, the officers explained that they would have taken a different course of action, *in accordance with* established policy, had Charfauros told them the truth about the firearms. Accordingly, *Schmies* is not applicable.

Charfauros's second contention is that defense counsel should have objected that the prosecutor's questions to the police officers called for speculation, in that the officers were required to speculate about what they would have done differently had Charfauros revealed there were weapons in the apartment. (See *People v. Babbitt* (1988) 45 Cal.3d

31

660, 682 [evidence may be excluded as irrelevant when it produces only *speculative* inferences regarding a disputed fact]; *People v. Gonzales* (2012) 54 Cal.4th 1234, 1260 [" 'Speculative inferences are, of course, irrelevant.' "].)  The objection would have lacked merit had defense counsel made it.  As the content of the officers' responses shows, the officers did not infer what they would have done differently based on *speculation*. Instead, as a sound basis for their testimony the officers described a departmental policy which requires that a SWAT team be called in when barricaded suspects are known to have firearms.

Charfauros's final contention is that defense counsel should have objected to the testimony about what the officers would have done differently on the ground that admission was barred under Evidence Code section 352.  Pursuant to Evidence Code section 352, "[a] trial court may exclude otherwise relevant evidence when its probative value is substantially outweighed by concerns of undue prejudice, confusion, or consumption of time."  (*People v. Scott* (2011) 52 Cal.4th 452, 490.)  " ' "The 'prejudice' referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues.  In applying section 352, 'prejudicial' is not synonymous with 'damaging.' " ' "  (*Id.* at p. 491.)  Here, as we have explained, the evidence had substantial probative value, as it was relevant to establish Charfauros's criminal liability under the natural and probable consequences doctrine.  Further, Charfauros has not identified any undue prejudice within the meaning of Evidence Code section 352.  Although testimony that the police officers would have called in a SWAT team might be damaging to

32

Charfauros's defense because it supports the People's case on the natural and probable consequences doctrine, it is not the type of evidence likely to evoke an emotional bias against Charfauros.

In sum, because the objections that Charfauros contends defense counsel should have made were without merit and were unlikely to have been sustained, Charfauros has not met his burden of establishing that defense counsel's performance was deficient or that he was prejudiced by defense counsel's failure to object. We accordingly reject Charfauros's claim of ineffective assistance of counsel based on defense counsel's failure to object to the officers' testimony.

C.	*Charfauros's Challenge to the Enhanced Sentence for the Attempted Murder Counts on the Ground That the Indictment Did Not Allege That the Attempted Murders Were Willful, Deliberate and Premeditated*

We next consider Charfauros's contention that because the indictment did not allege that the attempted murders of the four police officers were willful, deliberate and premeditated, the enhanced 15-year-to-life sentences for those counts violated Charfauros's statutory and due process rights.

1.	*Background*

In counts 2 through 5, Charfauros was charged with the attempted murder of Officers McLeod, Chinn, Whipple and Ruiz. The indictment alleged that Charfauros was criminally liable under section 664, subdivision (e), which provides that "if attempted murder is committed upon a peace officer . . . and the person who commits the offense knows or reasonably should know that the victim is a peace officer . . . , the person guilty

33

of the attempt shall be punished by imprisonment in the state prison for life with the possibility of parole."  (§ 664, subd. (e).)

Section 664, subdivision (f) provides for an enhanced sentence when a defendant is found guilty of attempting to murder a peace officer, "and it is also charged and admitted or found to be true by the trier of fact that the attempted murder was willful, deliberate, and premeditated."  (§ 664, subd. (f).)  If that finding is made, "the person guilty of the attempt shall be punished by imprisonment in the state prison for 15 years to life" and "shall not be released prior to serving 15 years' confinement."  (*Ibid*.)  Here, the indictment did not allege that the attempted murders were willful, deliberate and premeditated and did not identify section 664, subdivision (f) as a provision included in the charges against Charfauros.  Nevertheless, the jury was instructed that it should determine whether the attempted murders were willful, deliberate and premeditated.  The jury returned specific verdicts finding that the attempted murders in counts 2 through 5 were willful, deliberate and premeditated.  The trial court relied on those findings to sentence Charfauros according to the enhanced sentence in section 664, subdivision (f) on counts 2 through 5, imposing sentences of 15 years to life for each of those four counts.

2.      *Charfauros's Due Process Argument Lacks Merit and His Statutory Argument Has Been Forfeited*

Charfauros contends that the sentence of 15 years to life on counts 2 through 5 must be reversed because the indictment did not provide him with notice that he was being charged with committing willful, deliberate and premeditated attempted murders.

34

There are two separate issues raised when an enhanced sentence is imposed on a defendant according to a finding that he committed a willful, deliberate and premeditated attempted murder of a peace officer in a circumstance, like here, where the accusatory pleading does not allege a willful, deliberate and premeditated attempted murder.

The first issue is whether the defendant has been sentenced in violation of section 664, subdivision (f) because the statute requires that the defendant be *charged* with a willful, deliberate and premeditated attempted murder as required by the statute before an enhanced sentence may be imposed.  (§ 664, subd. (f) [stating that the enhanced sentence shall be imposed "if . . . it is . . . charged and admitted or found true" that the attempted murder was willful, deliberate and premeditated].)  The second issue is whether the defendant's due process rights have been violated by not receiving notice in the accusatory pleading that the People were seeking an enhanced sentence based on allegations the attempted murder was willful, deliberate and premeditated.  The due process issue arises because "[a] defendant has a due process right to fair notice of the allegations that will be invoked to increase the punishment for his or her crimes." (*People v. Houston* (2012) 54 Cal.4th 1186, 1227 (*Houston*).)

Here, as to the statutory issue, it is undisputed that the indictment did not comply with the requirements of section 664, subdivision (f) because it was not "*charged* . . . that

the attempted murder was willful, deliberate, and premeditated."  (§ 664, subd. (f), italics added.)[10]

The due process issue is more complicated and requires us to focus on the applicable legal principles and case law.  "The 'preeminent' due process principle is that one accused of a crime must be 'informed of the nature and cause of the accusation.' (U.S. Const., Amend. VI.)  Due process of law requires that an accused be advised of the charges against him so that he has a reasonable opportunity to prepare and present his defense and not be taken by surprise by evidence offered at his trial."  (*People v. Jones* (1990) 51 Cal.3d 294, 317 (*Jones*).)

The most applicable case considering due process issues in a similar context is our Supreme Court's decision in *Houston*, *supra*, 54 Cal.4th 1186.  *Houston* concerned the sentence enhancement in section 664, subdivision (a), which provides for an indeterminate life term, rather than a determinate term of five, seven or nine years, when the defendant has been charged with and found guilty of willful, deliberate and premeditated attempted murder.[11]

---

10    As we will explain after discussing the due process issue, because he did not raise the issue in the trial court, Charfauros has forfeited his right to any appellate remedy based on the fact that the indictment did not allege that the attempted murders were willful, deliberate and premeditated.

11    Here, Charfauros was charged with the attempted murder *of peace officers*. Therefore, section 664, subdivision (f), rather than section 664, subdivision (a), sets forth the enhancement applicable for an attempted murder that is willful, deliberate and premeditated.

36

In *Houston*, *supra*, 54 Cal.4th 1186, our Supreme Court concluded that although the accusatory pleading did not allege that the attempted murders were willful, deliberate and premeditated, the defendant received constitutionally adequate notice of those allegations. Specifically, during trial, while evidence was still being presented, the trial court in *Houston* explained to the defendant that the verdict forms would include specific findings for premeditated attempted murder, informed the defendant that he would be sentenced to life in prison if convicted, and asked the parties to comment on any problems with the proposed jury instructions and verdict forms. (*Id*. at p. 1227.) Under those circumstances, *Houston* concluded that the "defendant received adequate notice of the sentence he faced" even though the indictment did not allege that the attempted murders were willful, deliberate and premeditated. (*Id*. at p. 1228.)

Here, the situation is similar to *Houston*. The record shows that Charfauros was on notice during the course of the trial that the jury would be instructed to decide whether the attempted murders were willful, deliberate and premeditated. Specifically, during trial while evidence was still being presented in the People's case, counsel discussed proposed jury instructions with the trial court. One of instructions was CALCRIM No. 601, which informed the jurors that if they found Charfauros guilty of the attempted murders, they must also determine whether the attempted murders were willful, deliberate and premeditated. Defense counsel introduced the discussion of CALCRIM No. 601 by informing the trial court he was the one who "proffered" the instruction. The prosecutor responded by stating that he had "no objection to proffering a [section] 189

37

verdict form, and therefore, the appropriate instruction."[12] Counsel and the trial court then briefly discussed the People's theory that the jury could find the attempted murders to be willful, deliberate and premeditated "if the defendant, a co-conspirator or a participant . . . acts with" the required state of mind. Charfauros was in the courtroom when the discussion took place.

After three more days of testimony the People rested, the defense declined to present any testimony, and the jury was instructed, without objection, according to CALCRIM No. 601. The jury returned a specific finding that the attempted murders were willful, deliberate and premeditated, and at sentencing the probation officer's sentencing report stated that, based on that finding, section 664, subdivision (f) required that Charfauros be sentenced to terms of 15 years to life for each attempted murder count. Without objection from defense counsel, the trial court followed that recommendation and sentenced Charfauros to four consecutive terms of 15 years to life for the four attempted murder counts.

Under the circumstances, because the defense proffered the CALCRIM No. 601 instruction on willful, deliberate and premeditated attempted murder, Charfauros had notice that the jury was going to be deciding that issue. Further, because the instruction was discussed while there were still several days of trial remaining and the People had

---

[12]   Section 189 defines first degree murder as including, among other things, a "willful, deliberate, and premeditated killing." (*Ibid*.) Therefore in referring to a "[section] 189 verdict form" in the context of discussing the CALCRIM No. 601 instruction, the prosecutor was apparently referring to a verdict form asking the jury to decide whether the attempted murders were willful, deliberate and premeditated.

not yet rested their case, there was a meaningful opportunity for Charfauros to introduce evidence on the issue of whether the attempted murders were willful, deliberate and premeditated. Charfauros thus had a "reasonable opportunity to prepare and present his defense," foreclosing any argument that his constitutional due process rights were violated due to the fact that the indictment did not charge that the attempted murders were willful, deliberate and premeditated. (*Jones*, *supra*, 51 Cal.3d at p. 317.)

Having concluded (1) that the requirements of section 664, subdivision (f) were not satisfied because the indictment did not charge that the attempted murders were willful, deliberate and premeditated; but (2) Charfauros nevertheless received constitutionally adequate notice that the People were alleging that the murders were willful, deliberate and premeditated for the purposes of the sentence enhancement in section 664, subdivision (f), we next consider whether Charfauros is entitled to any relief on appeal. As we will explain, we conclude that Charfauros has forfeited any appellate challenge to the sentence enhancements on statutory grounds because he did not object in the trial court that the indictment lacked an allegation that the attempted murders were willful, deliberate and premeditated.

Our analysis of the forfeiture issue is controlled by *Houston*. In that case, our Supreme Court concluded that because the defendant had failed to object to instructing the jury on a theory that the attempted murders were willful, deliberate and premeditated, the defendant had forfeited any appellate challenge to the imposition of a sentence enhancement under section 664 based on the argument that the indictment did not allege the attempted murders were willful, deliberate and premeditated. (*Houston*, *supra*, 54

39

Cal.4th at pp. 1227-1228.) As *Houston* pointed out, the defendant received adequate notice of the sentence he faced, and "a timely objection to the adequacy of the indictment would have provided an opportunity to craft an appropriate remedy." (*Id.* at p. 1228.) Accordingly, he forfeited his appellate challenge to the sentence enhancement based on section 664. The same result applies here. As we have explained, Charfauros received notice of the allegations that the attempted murders were willful, deliberate and premeditated while there was still time to craft a remedy in the trial court. However, Charfauros did not object, and he accordingly forfeited his appellate challenge based on the People's failure to comply with the statutory requirement in section 664, subdivision (f) that the indictment allege that the attempted murders were willful, deliberate and premeditated.

3. *Charfauros Has Not Established Ineffective Assistance of Counsel Based on Defense Counsel's Lack of Objection to the Contents of the Indictment*

Charfauros contends that in the event we find forfeiture, he is nevertheless entitled to relief on the ground that defense counsel was ineffective for failing to object that the indictment lacked allegations that the attempted murders were willful, deliberate and premeditated.

As we have explained, a claim for ineffective assistance of counsel has two parts: deficient performance by counsel and prejudice to the defendant. (*Strickland*, *supra*, 466 U.S. at p. 687.) "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice that course should be followed." (*Id.* at p. 697.) As we will explain, because our analysis of the prejudice issue is dispositive, we need only reach that

40

issue to dispose of Charfauros's claim that defense counsel was ineffective for not objecting that the indictment failed to comply with section 664, subdivision (f) in that it did not allege that the attempted murders were willful, deliberate and premeditated.

To establish prejudice, Charfauros has the burden to show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland*, *supra*, 466 U.S. at p. 694.) Here, the question of prejudice must focus on the time period during trial when defense counsel was aware that the People were proceeding under a theory that the attempted murders were willful, deliberate and premeditated, at which point he could have made an objection that the theory was barred because the indictment did not comply with section 664, subdivision (f). That point during the trial was no later than the day when counsel discussed CALCRIM No. 601 with the trial court. It is unlikely that an objection at that point would have made a difference to the outcome of the trial. If defense counsel raised an objection at that point based on the fact that the indictment did not allege that the attempted murders were willful, deliberate and premeditated, the People would likely have requested that the trial court permit an amendment to the indictment to allege premeditation. (§ 1009 [trial court may permit an amendment of an indictment at any stage of the proceedings]; *Orlina v. Superior Court* (1999) 73 Cal.App.4th 258, 264 [rejecting the argument that a grand jury indictment cannot be amended by a trial court].)

As there would have been ample time left during trial for defense counsel to put on any additional evidence necessary to address the formal premeditation allegations, defense counsel would not have had a strong argument to defeat an amendment to

41

indictment, and the trial court undoubtedly would have permitted it. Indeed, as our Supreme Court noted in *Houston*, one reason for finding forfeiture in the context of defendant's failure to object to the absence of allegations of premeditation in the indictment charging attempted murder is that upon a timely objection by defense counsel, the prosecutor could have asked the trial court to amend the indictment and cure the problem. (*Houston*, *supra*, 54 Cal.4th at pp. 1227-1228.)

In sum, even had defense counsel objected, there is no reasonable probability that Charfauros would have obtained any different outcome, and he still would have been sentenced to an enhanced 15-year-to-life term under section 664, subdivision (f) for each of the attempted murders.

D. *Error in Imposing Full Terms Rather Than One-third of the Middle Term for Counts 7, 9, 10, 11, 12, 13 and 14*

For the determinate sentences on counts 7, 9, 10, 11, 12 and 14 the trial court imposed full-term sentences, which it ordered to be served consecutively but stayed pursuant to section 654. Charfauros contends that pursuant to section 1170.1, subdivision (a), the trial court should have imposed one-third of the middle term sentence for counts 7, 9, 10, 11, 12 and 14, and he seeks an order amending the abstract of judgment accordingly. The Attorney General concedes that the trial court erred and that the abstract of judgment should be amended. As we will explain, the parties' position has merit, and we will accordingly order the relief that Charfauros seeks.

When sentencing for the counts punished by determinate terms, the trial court selected count 15 as the principal term and imposed a full-term sentence of three years

42

for that count. Counts 6, 7, 9, 10, 11, 12, 13 and 14 were sentenced as subordinate terms. Pursuant to section 1170.1, subdivision (a), consecutive subordinate determinate terms "shall consist of one-third of the middle term of imprisonment prescribed" for those crimes and "one-third of the term imposed for any specific enhancements applicable to those . . . offenses." However, the trial court did not follow that provision for counts 7, 9, 10, 11, 12 and 14. Instead, for those counts, the trial court imposed and stayed the full middle-term sentences for each of those counts, including full-term enhancements.[13]

As the trial court did not sentence counts 7, 9, 10, 11, 12 and 14 according to the requirement that it impose one-third of the middle term for each count and one-third of any applicable enhancement, the sentences for those counts are unauthorized. An appellate court may correct an unauthorized sentence when the error is brought to its attention. (*People v. Valenzuela* (2009) 172 Cal.App.4th 1246, 1249 (*Valenzuela*); *People v. Dotson* (1997) 16 Cal.4th 547, 554, fn. 6.) We accordingly order that the trial court correct the abstract of judgment to reflect the imposition of one-third of the middle term for counts 7, 9, 10, 11, 12 and 14, and one-third of any applicable enhancement for those counts, all of which shall be stayed under section 654. So corrected, the stayed sentences for those counts shall be as follows: count 7 — one year; count 9 — eight

---

13    Specifically, the following consecutive terms were imposed and stayed for the applicable counts: count 7 — three years; count 9 — two years, plus a one-year enhancement; count 10 — two years; count 11 — 2 years; count 12 — two years, plus a one-year enhancement; and count 14 — two years, plus a one-year enhancement. The trial court imposed sentences for counts 6 and 13 based on one-third of the middle term, and those counts are accordingly not the subject of Charfauros's appeal.

months, plus a four-month enhancement; count 10 — eight months; count 11 — eight months; count 12 — eight months, plus a four-month enhancement; count 14 — eight months, plus a four-month enhancement.

E.      *Error in the Amount of the Laboratory Fee Imposed Under Health and Safety Code Section 11372.5, Subdivision (a)*

Charfauros's final contention is that the trial court erred in the amount of the laboratory fee that it imposed pursuant to Health and Safety Code section 11372.5, subdivision (a), because it imposed a fee of $205 instead of $100. The Attorney General concedes the error.

Health and Safety Code section 11372.5, subdivision (a) provides that for certain enumerated crimes, the defendant shall pay a criminal laboratory analysis fee of $50 for each separate offense. Here, Charfauros committed the enumerated crimes of (1) possessing a controlled substance for sale (*id*., § 11378 [count 9]); and (2) selling or furnishing a controlled substance (*id*., § 11379 [pursuant to the conspiracy charged in count 15]). Because each specific enumerated offense incurs a fee of $50, the trial court should have imposed a total fee of $100. Instead, the trial court imposed a fine of $205.[14]

Under our authority to correct unauthorized sentences, we may order that an improperly calculated fine be modified and corrected. (*Valenzuela*, *supra*, 172

_____

[14]      In imposing the $205 laboratory fee, the trial court stated that it was in the amount of "$205, including penalty assessments." Neither Charfauros nor the Attorney General identify a basis for an additional "penalty assessment," and in light of the Attorney General's concession that the amount of $205 was imposed in error, we conclude that no basis in the record has been identified for the assessment of a laboratory fee above $100.

44

Cal.App.4th at p. 1249.) We accordingly order that the laboratory fee imposed pursuant to Health and Safety Code section 11372.5, subdivision (a) be modified to the amount of $100.

## DISPOSITION

The trial court is ordered (1) to modify the abstract of judgment to reflect (a) the imposition of one-third of the middle term and one-third of any applicable enhancement for counts 7, 9, 10, 11, 12 and 14; and (b) the imposition of a laboratory fee of $100 pursuant to Health and Safety Code section 11372.5, subdivision (a); and (2) to forward an amended copy of the asbtract of judgment to the Department of Corrections and Rehabilitation. As modified, the judgment is affirmed.


IRION, J.

WE CONCUR:


BENKE, Acting P. J.


HALLER, J.